**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Mori Lee, LLC | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-7555 |
| | ) | |
| THE PARTNERSHIPS and | ) | Judge: Matthew F. Kennelly |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A," | ) | Magistrate: Young B. Kim |
| | ) | |
| | ) | |

**DECLARATION OF SUREN TER SAAKOV**

I, Suren Ter Saakov, of Philadelphia, Pennsylvania, declare as follows:

1. I am over 18 years of age. I have personal knowledge of the facts set forth herein. I make this declaration in support of Plaintiff's Ex Parte Motion for Entry of Temporary Restraining Order (the "Ex Parte Motion for TRO") and, if called as a witness, I could and would competently testify as follows:

2. In or about 1994, I received a degree in mathematics from Lomonosov Moscow State University. Since that time, my professional work has focused almost exclusively on building software programs and platforms including www.SEMrush.com, www.YouHaveDownloaded.com, www.XMLshop.com and www.Counterfeit.Technology.

3. I am the Chief Executive Officer and Founder of Counterfeit.Technology. Counterfeit.Technology uses a large web crawler coupled with sophisticated algorithms and detection models to identify counterfeit products offered for sale across the Internet. The web crawler collects content from websites and the algorithms identify which of the websites are likely counterfeiters, using a combination of information supplied by the clients and inspecting the websites for characteristics consistent with counterfeiting.

4. I have worked with Plaintiff to create a customized web crawler through the Counterfeit.Technology software program in order to detect online counterfeiters that are illegally using Plaintiff's trademarks and stealing Plaintiff's original, copyrighted images in order to advertise and sell imitation knockoffs in violation of Plaintiff's intellectual property rights.

5. In my experience as CEO and Founder of Counterfeit.Technology and working directly with the Plaintiff on this case, I have personally learned that Defendants facilitate sales of the Counterfeit Products by designing websites so that they appear to unknowing consumers to be authorized online retailers, outlet stores or wholesalers selling genuine products. These websites and marketplace listings look sophisticated and accept payment in U.S. Dollars. In many instances, Defendants unlawfully display the Mori Lee marks and advertise Counterfeit Products with stolen images in violation of the Plaintiff's Copyright as a way to deceive consumers into believing there are purchasing original products manufactured and sold by the Plaintiff.

6. The Defendants' Infringing Websites accept payment via Western Union, credit card and/or PayPal and ship the Counterfeit Products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos.

7. Defendants also deceive unknowing customers by using the Mori Lee marks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiff's original products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics to increase website rank by spending thousands of dollars each month on pay-per-click advertising. As a result, links to Defendants' websites show up at or near the top of popular search results and misdirect consumers searching for genuine Mori Lee Products.

8. As of the date of the filing of this action, I personally collected data from www.SEMrush.com, www.Alexa.com, and other statistic gathering systems and applied a mathematical analysis to estimate the traffic and sales volume for each named Defendant in this case. My analysis indicates that the total value of Defendants' collective monthly traffic to the Infringing Websites (both organic traffic and paid traffic through pay-per-click advertising) is approximately $436,000 for all Defendants resulting

in approximately 2,426,000 visitors to the Infringing Websites, generating approximately $1,692,000 in sales. Defendants have infringed upon the Mori Lee marks and copyrights approximately 9,200 times.

9. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Infringing Websites. Many of Defendants' names and addresses used to register the Infringing Websites are incomplete, contain randomly typed letters, or fail to include cities or states. Other Infringing Websites use privacy services that conceal the owners' identity and contact information. On information and belief, Defendants constantly create new Infringing Websites using the identities listed in Schedule "A" to the Complaint, as well as other unknown fictitious names and addresses.

10. Such registration patterns of Defendants' Infringing Websites are one of many tactics used by the Defendants to conceal both their identities and the full scope and interworking of Defendants' massive counterfeiting operation. Another tactic commonly used by Defendants to thwart enforcement efforts is to constantly change the location to which the Infringing Websites redirect.

11. Even though Defendants operate under multiple fictitious names, many similarities between the Infringing Websites indicate a coordinated effort to sell Counterfeit Products. For example, many of the Infringing Websites have virtually identical layouts, even though different aliases were used to register the respective domain names for these

Infringing Websites. In addition, Counterfeit Products for sale on the Infringing Websites bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source that Defendants are interrelated. The Infringing Websites also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Plaintiff's official website.

12. In my experience working with brand owners, who have either reported websites directly to search engines or domain registrars, or have initiated federal suit against operators of websites selling counterfeit products, I have learned that, upon notice of a legal action, counterfeiters often immediately set up a so-called "redirect" for their website, which essentially informs a search engine that the original website (which is involved in the legal action) has permanently moved to another domain, and instruct the search engine to divert traffic to that new domain. This methodology results in:

   a. A seamless (and barely noticeable) transition of the same counterfeiting enterprise to a new domain that has yet to be flagged for illegal activity;

b. An effective slingshot of the new domain to the top of the search engine results pages (by leveraging the Internet traffic from the old domain involved in a lawsuit, which was built through the illegal use of the applicable trademarks); and

c. A continuous, illegal operation, interrupted by customary legal process.

13. An example of such a practice is www.izidresses.com. When Internet traffic to a the disabled website that sold counterfeit products was "re-directed" to a new, virtually-identical website upon accumulation of so-called "take down" notices under the Digital Millennium Copyright Act of 1998 (hereinafter "DCMA"), as amended, 17 U.S.C. § 1201 et seq. Indeed:

a. The website www.izidresses.com operated since 2011, generating traffic, in part, by paying for advertisement through Google AdWords, as demonstrated on http://www.semrush.com/info/izidresses.com?db=us;

b. Once the domain name owner/registrant received complaints about copyright infringement under the DCMA, as illustrated in the thousands of "take down" notices submitted to Google (such complaints available at: http://www.google.com/transparencyreport/removals/copyright/domains/izidresses.com/), all the owner of this domain re-directed all Internet traffic heading for www.izidresses.com to a new, similar-sounding (and visually indistinguishable) domain – www.izidressbuy.com.

14. The above example demonstrates that when any advance notice of a lawsuit or request for injunctive relief is given to the owner/registrant of a website involved in counterfeiting, the requested relief is rendered ineffective and meaningless, because counterfeiters operate as a proverbial "moving target," beyond the effective reach of copyright owners, seeking to enforce their rights. Thus, the relief requested in Plaintiff's Ex Parte Motion for TRO is the most effective means by which to terminate Defendants' illegal activities.

15. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 12th Day of November, 2019.


_____
Suren Ter Saakov